IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JONATHAN RICHARD MYERS,                    *

    Plaintiff,                                     *

v.                                                       *          Civil Action No. GLR-22-3102

YESCARE CORP., et al.                          *

    Defendants.                                  *
                            ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Robert L. Green, Correctional Officer II Roman Yoder, and Correctional Officer II Andrew Wagner's (collectively the "State Defendants") Motion to Dismiss (ECF No. 34),[1] and Defendants Samuel Rahman and YesCare Corp.'s (collectively the "Medical Defendants") Motion for Summary Judgment (ECF No. 36). The Motions are ripe for review, and no hearing is necessary.  See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motions.

## I.      BACKGROUND

### A.      Myers' Allegations

Plaintiff Jonathan Richard Myers is currently an inmate at Western Correctional Institution ("WCI") in Cumberland, Maryland. (Compl. at 1, ECF No. 1).[2] Myers brings

---

[1]  The Clerk shall be directed to amend the docket to reflect the State Defendants' full and correct names.

[2]  Citations refer to the pagination assigned by the Court's Case Management and Electronic Case File (CM/ECF) system.

this action against COII Yoder, COII Wagner, and Secretary of the Department of Public Safety and Correctional Services ("DPSCS") Robert Green as well as Samuel Rahman and YesCare Corp., who provide medical care to DPSCS inmates. (Id.). Myers presents two distinct claims, each described below.

First, Myers claims that on October 27, 2020, he was seen by NP Holly Hoover because he had a piece of steel lodged in his arm from an incident while he was working at the maintenance department at Maryland Correctional Training Center.  (Compl. at 2, ECF No. 1). He states that following an x-ray on November 5, 2020, he was scheduled for a surgical consultation. (Id.). On March 15, 2021, following his consultation, Myers was scheduled for surgery with Dr. Michael Stasko three weeks later. (Id.). However, Myers asserts that at the time of filing the Complaint, November 30, 2022, he had still not received treatment. (Id.).

Second, Myers asserts that on March 7, 2022, while housed at North Branch Correctional Institution ("NBCI"), prison officials woke him up around 8:00 p.m. with no explanation and handcuffed him. (Compl. at 5). He states that he heard someone call his name. (Id.). Believing it was the Housing Unit Sergeant calling him for a strip search, he stood up and walked about ten steps before COII Wagner jumped on his back, placed him in a choke hold, and told him to get down on the ground. (Id.). Myers tried to yell while Wagner's arm tightened around his throat. (Id.). He also tried to shake Wagner off his back. (Id.). Myers states COII Yoder "chopped block[ed]" him in the back of his knees, causing him to fall. (Id.). While on his back, Myers states that Wagner grabbed him by the throat and punched him in the face while Yoder held his legs. (Id.). Myers asserts that he was not

evaluated by medical staff until the following day. (Id.). Myers showed the nurse his foot, which was black, but he was given only an ace bandage and sent back to his cell. (Id. at 5–6). Since then, he has seen a nurse five times and received two x-rays but has not received a walking boot or consultation with a specialist. (Id. at 6). He states that his foot has healed improperly, causing him to drag his foot. (Id.).

In his Supplement to the Complaint, Myers alleges that as to both claims, his medical issues were addressed only when a third party, such as a social worker or an Internal Investigation Division ("I.I.D.") Detective, contacted the medical department concerning his injuries. (Suppl. Compl. at 1, ECF No. 7). Myers claims that Rahman, the Chief Medical Facilitator, is responsible, along with YesCare Corp., for providing quality medical care at the relevant facilities. (Id. at 2).

## B.    Medical Defendants' Response

### 1.    Declaration of Sam Rahman

Defendant Sam Rahman attests that since May 4, 2022, he has been employed by YesCare Corp. as the Director of Operations for the Cumberland Region and served in that same position for Corizon Health, Inc. since January 1, 2019. (Rahman Decl. ¶ 2, ECF No. 36-2). Rahman denies being personally aware that either Corizon or YesCare maintains a custom or policy of denying medical care due to cost or any other reason. (Id. ¶ 5). He further denies that he or YesCare has a policy or custom of delaying their response to medical needs until the issue is raised by a third party. (Id.).

Rahman avers that his role is purely administrative and he is not a medical provider. (Id. ¶ 6). Thus, he asserts that he does not dictate medical care in any way. (Id.). Medical

decisions are determined by the onsite medical providers and Utilization Management ("UM"). (Id.). He explains that onsite providers submit requests "for certain diagnostic tests or offsite appointments with specialists, and those requests are reviewed by UM, who determine whether medical necessity has been demonstrated for the test or appointment. (Id.). UM may approve a request, request more information, or return an Alternative Treatment Plan ('ATP') suggesting a different course of action. (Id.). The onsite providers can accept or appeal the ATPs." (Id.). Rahman is not involved in this process. (Id.).

Rahman also attests that he is not responsible for scheduling or staffing; rather, the Regional Medical Director oversees the providers, and the Regional Director of Nursing oversees the nursing staff. (Id. ¶ 7). Health Services Administrators manage medical records, scheduling, and grievances, among other things. (Id.). Rahman attests that all of these positions report to him administratively and he provides "support to our site leaders, manage[s] finance/budgets, client needs, and implement[s] operation policies and procedure . . ." (Id.).

Finally, Rahman avers that he does not remember receiving any letters from Myers. (Id. ¶ 8). When mail is received in the medical department, the Health Services Administrators review and distribute it. (Id.). Rahman attests that upon receipt of letters addressed to him, he reviews them and routes them back to the Regional Director of Nursing or a Health Services Administrator to take the appropriate action. (Id.).

### 2. Medical Records

On October 27, 2020, while incarcerated at NBCI, Myers saw NP Holly Hoover for a sick call regarding a metal splinter in his right elbow. (Medical Rs. Part 3 at 5, ECF No.

36-5).  He reported that it had entered his elbow years prior and often causes discomfort when moving. (Id.). Hoover assessed a "foreign body granuloma" and ordered an x-ray. (Id. at 4–5).

On November 5, 2020, an x-ray was taken of Myers' right elbow; it showed "an irregular triangular opacity in the medial soft tissues overlying the proximal third of the olecranon."  (Medical Rs. Part 4 at 9, ECF No. 36-6). Hoover requested a consultation with a general surgeon, which was approved. (Medical Rs. Part 3 at 1–3; Medical Rs. Part 6 at 6, ECF No. 36-8). Myers was scheduled for an appointment with Dr. Stasko on March 15, 2021. (Medical Rs. Part 6 at 6).

Dr. Stasko found that Myers had mild tenderness in the right elbow region but no palpable mass lesion, and he diagnosed Myers with a superficial foreign body in his right upper arm. (Medical Rs. Part 4 at 10). He noted that local exploration using fluoroscopic guidance was required and recommended that Myers come back in three weeks for the surgery. (Id.).

During a chronic care visit on November 16, 2021, Myers inquired about any follow up from his appointment with Dr. Stasko and LPN Lori Keister noted that the off-site scheduler would be contacted for more information. (Medical Rs. Part 2 at 16, ECF No. 36-4). Myers saw PA Adane Negussie and RN Jessica Coffman on March 8, 2022, for a possible foot injury. (Id. at 8, 10). Examination showed Myers' left big toe was swollen, tender and warm to the touch, and discolored. (Id.). Bruising and swelling extended from the left big toe "down the medial left foot." (Id. at 10). Myers was given 600 mg ibuprofen

and directed to continuing taking the ibuprofen twice a day and use an ice pack as needed. (Id.). Negussie also ordered an x-ray of Myers' foot. (Id. at 7).

Medical Defendants submit two "Release of Responsibility" waivers asserting that Myers refused medical care on March 7, 2022, immediately following the use of force incident, and refused to go to his x-ray appointment on March 11, 2022. (Medical Rs. Part 2 at 13; Medical Rs. Part 4 at 31). However, the documents are either blank or state that Myers refused to sign but do not include the signature of a second witness as required by the form. (Medical Rs. Part 2 at 13).[3] Myers returned to see RN Coffman on June 29, 2022, about his injury. (Id. at 4–6). He reported that no one had come to his door to take him when the last x-ray was ordered. (Id. at 6). He complained that the pain medication was not helping and that due to the delay, his toe was healing sideways causing him to limp and experience additional pain. (Id. at 4). Myers also reported that he had not heard anything about the splinter in his right elbow since his consult in 2021. (Id.). RN Coffman referred him to a provider and submitted new orders for an x-ray. (Id. at 5).

On July 13, 2022, an x-ray was taken of Myers' left foot. (Medical Rs. Part 4 at 36). Findings showed "an oblique lucency across the base of the first proximal phalanx medially extending to the MTP joint" and a "[l]oose body at the first DIP joint suggestive of prior injury." (Id.). The radiologist concluded that there was an "age indeterminate avulsion at the base of the first proximal phalanx." (Id.).

---

[3] The Release of Responsibility clearly states: "A second witness is required if patient refuses to sign release." (Medical Rs. Part 4 at 31, ECF No. 36-6). As the release was not properly executed, the Court will not consider it as evidence of Myers' refusal to get x-rays.

Myers saw RN Coffman for another sick call on August 17, 2022, complaining that he had not been seen for either the foreign body in his right arm or his foot injury. (Medical Rs. Part 1 at 32–33, ECF No. 36-3). Coffman noted that Myers had a severely limited range of motion in his toes which worsened by use and caused difficulty with daily living activities. (Id.). Myers was referred to a provider and Coffman emailed the scheduler regarding the delay. (Id. at 32). Myers saw RN Coffman again on September 12, 2022, complaining that he had not been seen by a provider. (Id. at 30–31). Coffman noted that referrals had been placed June 29, July 7, and August 17, 2022. (Id. at 30). She placed a fourth referral that same day and notified the scheduler of the fourth request. (Id.). PA Negussie saw Myers later that same day. (Id. at 27–29). Myers reported that he could not move his first three toes and was therefore having difficulty walking; his pain was a 9 on a 10-point scale. (Id. at 27). Negussie found no swelling or erythema, but she noted an "exaggerated reaction" to pain when palpated. (Id.). Myers also complained about the foreign body in his arm, which was still not palpable on exam. (Id.). Negussie prescribed Myers 500 mg Naproxen. (Id. at 29).

Myers received another x-ray of his right elbow on September 14, 2022, which again showed a metallic foreign body in the soft tissue. (Medical Rs. Part 5, ECF No. 36-7). Myers was transferred from NBCI to WCI on September 21, 2022. (Medical Rs. Part 1).[4] On November 4, 2022, Myers saw Dr. Masoud Djahanmir for a provider visit. (Id. at 11–

---

[4] Medical Defendants state that Myers refused his next sick call appointment on October 8, 2022, but again submit a Release of Responsibility which is unsigned by Myers and does not have a second witness signature and thus will not be considered by the Court. (Medical Rs. Part 5 at 8).

14). Dr. Djahanmir reviewed Myers' records and scheduled him with podiatrist Dr. Michael Berger. (Id.). He also ordered Tylenol for Myers to take as needed. (Id.).

Myers saw Dr. Berger on November 17, 2022, for an evaluation of his left toe pain. (Medical Rs. Part 1 at 8–10). Myers reported continued pain from the fracture to his proximal phalanx of his left big toe. (Id. at 8). Dr. Berger's exam revealed palpable pedal pulses with brisk capillary refill, his skin was warm/dry and well perfused. (Id. at 9). He also noted that there was no deformity or sign of trauma. (Id.). Dr. Berger ordered another x-ray and advised Myers that if a fragment was present, he may consider surgical removal. (Id.). Finally, Dr. Berger ordered a surgical shoe to assist Myers with walking, and Myers received it on November 21, 2022. (Id.; Medical Rs. Part 5 at 11–12).

The x-ray of Myers' left foot on April 25, 2023, showed no evidence of a fracture, soft tissue fracture, or foreign body. (Medical Rs. Part 6 at 26). On May 5, 2023, Myers saw RN Kimberly Fazenbaker for a sick call regarding pain in his left foot. (Id. at 18–20). He reported that he was waiting for a follow-up with Dr. Berger and that neither the surgical shoe nor medication were reducing his pain. (Id. at 19). Myers also complained that nothing had been done regarding the metallic foreign body in his arm, which still caused pain with specific movements but did not limit his range of motion. (Id.). Fazenbaker noted that Myers had pain in his toes with palpitation and movement, but his toes were not swollen. (Id.). Myers was referred to Dr. Berger. (Id. at 20). He refused the offered Motrin or Tylenol. (Id.).

Myers saw Regional Medical Director Dr. Susan Arnoult for a provider visit on June 14, 2023. (Medical Rs. Part 8 at 15–16, ECF No. 36-9). Dr. Arnoult noted that the initial

x-rays showed an avulsion fracture, but that Myers' most recent x-ray was normal. (Id. at 15). Myers walked with a limp and upon examination, Dr. Arnoult concluded that Myers suffered from an "internal disruption and non-healing of a ligament in the toe." (Id. at 16). She further noted that while an MRI would be ideal, because of the metallic object in his arm, she instead requested a CT scan of Myers' foot. (Id.). Myers also saw NP Janette Clark for a provider visit on June 16, 2023. (Id. at 10–11). After examination, Clark also requested a podiatry follow-up as well as a general surgery consult for the foreign body in Myers' arm. (Id. at 10). On June 28, 2023, the Acting Statewide UMMD discussed the CT scan request and directed that Myers first be seen by Dr. Berger. (Id. at 19). The Acting Statewide UMMD also upheld their decision that the foreign body in Myers' arm did not require surgical intervention as a medical necessity and that it would be considered an elective procedure. (Id. at 24).

Dr. Berger saw Myers for a provider visit on June 29, 2023. (Id. at 18). He reviewed the x-rays and noted no evidence of an acute fracture, dislocation, or ligament injury. (Id.). Dr. Berger concluded that Myers had "chronic arthritic change to left great toe IP joint with mild bunion deformity present . . ." (Id.). In response, UM returned an ATP finding that there was no medical necessity for the CT requested by Dr. Arnoult because there was no evidence of a fracture or dislocation. (Id. at 17). Dr. Arnoult agreed to the ATP. (Id.).

## C.   **Procedural History**

The Court received Myers' Complaint on November 30, 2022, against Defendants COII Yoder, COII Wagner, DPSCS Secretary Robert Green, Samuel Rahman, Corizon

Health, and YesCare Corp.[5] The Complaint alleges that Defendants failed to provide adequate medical care and used excessive force against him. Myers was granted leave to supplement the Complaint to identify any individuals responsible for failing to provide him adequate medical care and to state any facts supporting claims against them following the provision of his medical records for review. (ECF No. 4). Myers filed a Supplement to the Complaint on February 9, 2023. (ECF No. 7). Myers stated that he could not identify any particular medical providers responsible and instead alleges that it was the "entire medical system" because his medical needs were only addressed when a third party raised them with the medical providers. (Suppl. Compl. at 1). The Court construed his allegations against YesCare Corp. and Samuel Rahman as alleging that they have a policy or custom of not responding to medical needs unless the issues are raised by third parties. (Id. at 1–2). Myers seeks immediate medical attention to remove the steel from his arm and to reset his broken foot as well as monetary damages. (Compl. at 3).

On June 20, 2023, the State Defendants filed a Motion to Dismiss. (ECF No. 34). Myers responded in opposition on November 27, 2023, (ECF No. 44), and the State Defendants replied on December 12, 2023, (ECF No. 48). On July 19, 2023, the Medical Defendants filed a Motion for Summary Judgment. (ECF No. 36). Myers responded on August 18, 2023, (ECF No. 40), and the Medical Defendants replied on September 1, 2023, (ECF No. 41).

---

[5] A stay was entered as to Defendant Corizon Health, Inc. on March 8, 2023, pursuant to ongoing bankruptcy proceedings. (ECF No. 9). Following disposition of the claims against all other Defendants, the case as to Corizon will remain stayed but will be administratively closed.

## II.   DISCUSSION

**A.   Standard of Review**

**1.   Motion to Dismiss**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268

(1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Complaints drafted by self-represented plaintiffs are held to a less stringent standard than those drafted by attorneys, and courts must liberally construe these complaints. See Johnson v. Silver, 742 F.2d 823, 825 (4th Cir. 1984). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 2. Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Id. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

**B.** **State Defendants' Motion to Dismiss**

The State Defendants argue that the Complaint should be dismissed because (1) Myers has failed to state a claim of medical negligence,[6] (2) Myers has failed to exhaust his administrative remedies as to his excessive force claim, and (3) Secretary Green is entitled to immunity under the Eleventh Amendment. (Mem. Supp. Mot. Dismiss ["Mot. Dismiss"] at 13–19, ECF No. 34-1). The Court will address each of these arguments below.

**1.** **Exhaustion**

State Defendants assert that the excessive force claim against Defendants Wagner and Yoder must be dismissed because Myers has failed to exhaust his administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. (Id. at 7). The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated

---

[6] If Myers alleges any medical claim against the State Defendants, the Court construes it as a claim of deliberate indifference under the Eighth Amendment. With a generous construction of the Complaint, Myers has, at most, stated that following the alleged excessive force incident, a medical provider did not evaluate him until the following day. (Compl. at 5.)  Even liberally construed, this is insufficient to state any claim of negligence or deliberate indifference against the State Defendants and must be dismissed.

delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 527–28 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading standard on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007). A claim that has not been exhausted may not be considered by this Court. See Jones, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. See Ross v. Blake, 136 S.Ct. 1850, 1856–57 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th

Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." <u>Aquilar-Avellaveda v. Terrell</u>, 478 F.3d 1223, 1225 (10th Cir. 2007).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any Division of Correction ("DOC") official or employee. Md. Code Ann., Corr. Servs. § 10-206(a). However, to have a grievance approved by the IGO, the prisoner must first follow the institutional grievance process before filing a grievance with the IGO. <u>See id.</u> § 10-206(b). Inmates housed at an institution operated by the Department of Public Safety and Correctional Services ("DPSCS") may avail themselves of the administrative remedy procedure ("ARP") designed for inmate complaint resolution. <u>See generally id.</u> § 10-201 <u>et seq.</u>; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining an ARP).

A prisoner in a DOC institution must file an ARP with the facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file an appeal with the Commissioner of Correction. <u>Id.</u> 12.02.28.14(B)(5). If the Commissioner of Correction denies the appeal, the prisoner has thirty days to file a grievance with the IGO. <u>Id.</u> 12.02.28.18. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. <u>Id.</u> 12.07.01.04(B)(9)(a). If the

grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Code Ann., Corr. Servs. § 10-207(b)(1); see also COMAR 12.07.01.07(B). An order of dismissal constitutes the final decision of DPSCS for purposes of judicial review. Md. Code Ann., Corr. Servs. § 10-207(b)(2)(ii). An inmate has not exhausted their administrative remedies until they have pursued their grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In Ross v. Blake, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." Id. at 635. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. Id. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" Id. at 636. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

The Supreme Court stated in Ross that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. See Chase, 286 F.Supp.2d at 529–30. As a prisoner, Myers is subject to the strict requirements of the exhaustion provisions. See Porter, 534 U.S. at 528 (making no distinction with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits

alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. See Booth, 532 U.S. at 741.

The Ross court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. at 643–44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

State Defendants assert that Myers did not file an ARP concerning the March 7, 2022 incident until October 29, 2022, over 7 months after the alleged use of excessive force. (See Mot. Dismiss at 9). As Myers failed to timely file his ARP, he has failed to properly exhaust his administrative remedies. Furthermore, even if the untimeliness of his initial ARP could be overlooked, Myers failed to complete all three steps of the exhaustion process, only appealing to the Commissioner of Correction. (See Appeal to Commissioner at 1, ECF No. 34-3). As such, Myers failed to exhaust his excessive force claim against Defendants Wagner and Yoder.

In his Opposition, Myers contends that his earlier attempts at exhausting his administrative remedies were "intentionally ignored after filing formal complaints against Officers Wagner and Yoder." (Resp. Opp'n ["Opp'n Mot. Dismiss"] at 8, ECF No. 44). State Defendants dispute Myers' allegations, asserting that he fails to provide any evidence of having filed prior complaints, such as the dates of filing or copies of the formal complaints. (Reply Mot. Dismiss at 3, ECF No. 48). The Court agrees. Myers has provided no evidence to demonstrate that he attempted to file earlier grievances nor to support his conclusion that they were ignored. As such, Myers fails to show that these administrative remedies were unavailable to him. The Complaint against Defendant Yoder and Wagner will be dismissed without prejudice.

### 2. Eleventh Amendment Immunity and Supervisory Liability

State Defendants also argue that Defendant Green, who is sued in his official capacity as the Secretary of DPSCS, is entitled to immunity. (Mot. Dismiss at 10–11). Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.") (citations omitted)).

The Supreme Court, however, has "permit[ted] citizens to sue state officials to enjoin the enforcement of unconstitutional laws," creating "an exception to the general constitutional command that federal courts do not have jurisdiction over suits by citizens

against the states." Lyle v. Griffith, 240 F.3d 404, 412 (4th Cir. 2001) (Wilkinson, C.J., dissenting) (citing Ex parte Young, 209 U.S. 123, 154, 156 (1908)). "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md., Inc. v. Pub. Service Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)); see also Alden v. Maine, 527 U.S. 706, 757 (1999) ("The rule, however, does not bar certain actions against state officers for injunctive or declaratory relief."); CareFirst, Inc. v. Taylor, 235 F.Supp.3d 724, 735 (D.Md. 2017) ("It clearly is proper to sue a government official in his official capacity, and it can be essential to the claim where, as here, plaintiffs assert that they are entitled to declaratory and injunctive relief under Ex parte Young."). In other words, Eleventh Immunity does not bar suits seeking declaratory or prospective injunctive relief, as long as such relief would not impose monetary liability. See Edelman v. Jordan, 415 U.S. 651, 664 (1974); see also McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (explaining that a state officer who has a "special relation" to the injunctive relief plaintiff seeks may be sued in his official capacity to ensure that any "federal injunction will be effective with respect to the underlying claim") (quoting S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 333 (4th Cir. 2008)).

Here, Myers seeks prospective injunctive relief (immediate medical attention) in addition to monetary damages against all Defendants. (Compl. at 3). As such, Defendant Green is not entitled to Eleventh Amendment immunity on the injunctive relief claim.

However, as Myers fails to allege Green's personal participation in any constitutional violation or that he is liable in his supervisory capacity, the Complaint against him must be dismissed in its entirety.

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Myers does not allege any facts which support a finding that Green personally participated in a constitutional violation in connection with the removal of the metal shard from his arm or his foot injury, or that he was deliberately indifferent to or tacitly

authorized any such violation of Myers' rights. His Opposition, which provides only conclusory allegations as to Defendant Green's failures to properly train and supervise, is insufficient. (See Opp'n at 4, 10–11). Accordingly, the Complaint must be dismissed against him.

## C.   Medical Defendants' Motion for Summary Judgment

### 1.   Eighth Amendment Deliberate Indifference Standard

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see Estelle v. Gamble, 429 U.S. 97, 102 (1976); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). To sustain a claim for denial of medical care under the Eighth Amendment, the plaintiff must show that defendants' acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). Medical Defendants argue that Myers' metal splinter was not a serious medical need. (Mem. L. Supp. Mot. Summ. J. ["Mot. Summ. J."] at 13, ECF No. 36-1).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503

U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Anderson, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" Anderson, 877 F.3d at 545 (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)); see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a

substantial risk from the very fact that the risk was obvious." <u>Scinto</u>, 841 F.3d at 226 (quoting <u>Farmer</u>, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844; <u>see also</u> <u>Cox v. Quinn</u>, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").

### 2.    Metallic Foreign Body Claims

Medical Defendants assert that they are entitled to summary judgment as to Myers' claim that he did not receive adequate treatment for the metallic sliver lodged in his arm because it did not present an objectively serious medical need. (Mot. Summ. J. at 13). The record before the Court shows that the YesCare Utilization Management team ultimately determined that surgical removal of the metallic sliver was not medically necessary because it was not interfering with Myers' activities of daily living. Thus, Myers' condition had not been diagnosed as mandating treatment. Furthermore, as Myers reported only mild discomfort, it was not obvious that surgical repair was necessary. Although the Court acknowledges that it took an extended period of time for Utilization Management to come to a decision following the initial consult, the Court cannot find that Myers presented with an objectively serious medical need. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985) (citing <u>Gittlemacker v. Prasse</u>, 428 F.2d 1, 6 (3d Cir. 1970)); <u>accord</u> <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) ("[W]e consistently have found such disagreements to fall short

of showing deliberate indifference."). As no exceptional circumstances are presented here, the Medical Defendants are entitled to summary judgment on this claim.

### 3.     Foot Injury Claims

As to Myers' foot injury, Medical Defendants do not contest that it presented an objectively serious medical need. (Mot. Summ. J. at 14). They contend, however, that they are entitled to summary judgment because Myers cannot demonstrate deliberate indifference by the Medical Defendants. (Id.). As to Defendant Rahman, Myers only seeks to hold him responsible in his supervisory capacity. The record shows that Rahman is not a medical provider nor does he have the power to dictate how medical care is provided. Furthermore, nothing in the record shows that Rahman had any actual or constructive knowledge that a subordinate was engaging in behavior that posed a risk of constitutional injury to Myers or that there was widespread and pervasive misconduct that posed a risk to individuals such as Myers. The Court finds that Rahman was neither deliberately indifferent to nor did he tacitly authorize any misconduct by his subordinates, and thus Myers' claim for supervisory liability fails and Defendant Rahman is entitled to summary judgment in his favor.

The final Defendant is YesCare Corp. against whom Myers has alleged there is a custom or policy by which medical care is only provided when the issue is raised by a third party rather than an inmate. Myers has done little to support the allegation that he only received attention at the request of those outside the medical department. The medical records provided show that he has been continuously seen by medical providers over the past two years to treat his foot injury. Although there are factual disputes about

appointments refused and delays in follow up care, the record does not provide any evidence that this care was provided only at the request of someone other than Myers. He provides no support for his claim in his opposition and instead reasserts his version of the facts and objects to how YesCare determines what treatment is medically necessary. However, Myers' objections are once again mere disagreements with the chosen course of treatment, which, as discussed above, are not the basis for a constitutional violation. As he provides no evidence of an unconstitutional policy or custom or other deliberate indifference by Defendant YesCare, summary judgment must be granted in its favor.

### III.   CONCLUSION

For the foregoing reasons, the State Defendants' Motion to Dismiss (ECF No. 34) and the Medical Defendants' Motion for Summary Judgment (ECF No. 36) will be granted. A separate Order follows.

Entered this 7th day of February, 2024.


_____/s/_____
George L. Russell, III
United States District Judge